**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**LAKE CHARLES DIVISION**

| | |
|---|---|
| ROBIN SMITH, | Case No. 2:23-cv-01610 |
| *Plaintiff,* | Judge James D. Cain |
| v. | Magistrate Judge Kathleen Kay |
| | JURY TRIAL DEMANDED |
| ELI LILLY AND COMPANY, | |
| *Defendant.* | |

**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff, ROBIN SMITH, by her attorneys, THE TOWNSLEY LAW FIRM, now amends her Complaint and, in so doing, alleges as follows:

**<u>ORIGINAL COMPLAINT</u>**

1.      Plaintiff's original Complaint is attached hereto as an exhibit and is incorporated by reference as if copied herein *in extenso*.

**<u>JURISDICTION AND VENUE</u>**

2.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332, because the amount in controversy as to the Plaintiff exceeds $75,000.00, exclusive of interest and costs, and because Defendant is incorporated and has its principal place of business in a state other than the state in which the named Plaintiff resides, which is Louisiana.

3.      This Court has personal jurisdiction over Defendant, consistent with the United States Constitution and LA R.S. 13:3201 (Louisiana's "long arm" statute), as Plaintiff's claims arise out of Defendant's transaction of business and the tortious acts within the State of Louisiana, and by virtue of Defendant's substantial, continuous, and systematic contacts with the State of Louisiana unrelated to Plaintiff's claims.

1

## NATURE OF THE CASE

4.      This is an action for damages suffered by Plaintiff, ROBIN SMITH, who was severely injured as a result of her use of Mounjaro, an injectable prescription medication that is used to control blood sugar in adults with type 2 diabetes.  Plaintiff, Mark Smith, is a party to his action due to his loss of consortium, services and society with his wife as a result of her injuries.

5.      Mounjaro is also known as tirzepatide. Mounjaro works by targeting the body's receptors for GIP (glucose-dependent insulinotropic polypeptide) and GLP-1 (glucagon-like peptide-1).

6.      Mounjaro belongs to a class of drugs called GLP-1 receptor agonists ("GLP-1 RAs").

7.      Defendant acknowledges that gastrointestinal events are well known side effects of the GLP-1 class. However, Defendant has downplayed the severity of the gastrointestinal events caused by Mounjaro, never, for example, warning of the risk of gastroparesis ("paralyzed stomach").[1]

8.      Gastroparesis is a condition that affects normal muscle movement in the stomach. Ordinarily, strong muscular contractions propel food through the digestive tract. However, in a person suffering from gastroparesis, the stomach's motility is slowed down or does not work at all, preventing the stomach from emptying properly. Gastroparesis can interfere with normal digestion, cause nausea, vomiting, abdominal pain, abdominal bloating, severe dehydration, a feeling of fullness after eating just a few bites, vomiting undigested food, undigested food that

---

[1] Mounjaro's label mentions gastroparesis without warning of the risk; rather, it states that Mounjaro "has not been studied" in patients with gastroparesis or other severe gastrointestinal disease, "and is therefore not recommended in these patients[,]" and it lists gastroparesis among other medical conditions for patients to discuss with their healthcare providers. https://dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?setid=d2d7da5d-ad07-4228-955f-cf7e355c8cc0 (last visited on 8/24/23).

hardens and remains in the stomach, acid reflux, changes in blood sugar levels, lack of appetite, weight loss, malnutrition, and a decreased quality of life. There is no cure for gastroparesis.[2]

9.      Wernicke's encephalopathy is a degenerative brain disorder caused by a lack of thiamine (vitamin B1), leading to damage of the brain's thalamus and hypothalamus. Patients with Wernicke's encephalopathy suffer from mental confusion, vision problems, hypothermia, low blood pressure, lack of muscle control, and even coma. The chronic, progressive phase of Wernicke's encephalopathy, known as Korsakoff syndrome or Korsakoff's amnesiac syndrome, results in amnesia, tremor, coma, disorientation, and vision problems. Even if Wernicke's encephalopathy is treated, there may be little improvement in memory function.[3]

## PARTY PLAINTIFF

10.     Plaintiff, ROBIN SMITH, is a citizen of the United States, and is a resident of the State of Louisiana.

11.     Plaintiff, MARK SMITH, is a citizen of the United States, and is a resident of the State of Louisiana.

12.     Plaintiff, Robin Smith, was born on April 17, 1963.

13.     Plaintiff, Robin Smith, used Mounjaro for approximately 10 months, from on or about October 7, 2022, to on or about August 26, 2023.

14.     Plaintiff's physician(s) (collectively "prescribing physician(s)") prescribed the Mounjaro that was used by Plaintiff.

---

[2] *Gastroparesis*, Mayo Clinic (June 11, 2022) available at https://www.mayoclinic.org/diseases-conditions/gastroparesis/symptoms-causes/syc-20355787 (last visited on 8/24/23).
[3] *Wernicke-Korsakoff Syndrome*, National Institute of Neurological Disorders and Stroke (January 31, 2023) available at https://www.ninds.nih.gov/health-information/disorders/wernicke-korsakoff-syndrome#:~:text=The%20disorder's%20main%20features%20are,Dietary%20deficiencies

3

15.     As a result of using Defendant's Mounjaro, Plaintiff was caused to suffer from gastroparesis and its sequelae and, as a result, sustained severe and permanent personal injuries, pain, suffering, and emotional distress, and incurred medical expenses.

16.     As a result of using Defendant's Mounjaro, Plaintiff was caused to suffer from gastroparesis, which resulted in, among other things, development of Wernicke's encephalopathy and its sequelae, which resulted in, for example, the inability to walk or function without assistance, requiring constant care in a nursing facility. Plaintiff has suffered muscle weakness causing falls, memory loss, and other aspects of altered mental status, with recommendation for hospice care due to her expected poor outcome. Plaintiff has suffered from other gastroparesis sequelae, including severe vomiting, stomach pain, gastrointestinal burning, abdominal bloating, hospitalization for stomach issues on several occasions including visits to the emergency room, and the requirement of additional medications to alleviate her severe vomiting.

17.     Plaintiff's injuries were caused by Defendant's Mounjaro.

## PARTY DEFENDANT

18.     Defendant Eli Lilly and Company ("Eli Lilly") is an Indiana corporation with a principal place of business at 893 S. Delaware St., Indianapolis, Indiana.

19.     Eli Lilly designed, researched, manufactured, tested, labeled, advertised, promoted, marketed, sold, and/or distributed Mounjaro and is identified on its label.[4]

---

[4] Mounjaro prescribing information, available at
https://dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?setid=d2d7da5d-ad07-4228-955f-cf7e355c8cc0 (last visited on 8/24/23).

## FACTUAL BACKGROUND

**A.    FDA's Approval of Mounjaro**

20.    On September 14, 2021, Eli Lilly submitted NDA 215866 Mounjaro (tirzepatide) injection as an adjunct to diet and exercise to improve glycemic control in adults with type 2 diabetes mellitus. On May 13, 2022, the FDA approved NDA 215866.[5]

21.    On May 13, 2022, Eli Lilly announced the FDA's approval of NDA 215866 Mounjaro (tirzepatide) injection as an adjunct to diet and exercise to improve glycemic control in adults with type 2 diabetes. In the press release, Eli Lilly disclosed a safety summary and provided a link to the Medication Guide and Prescribing Information, but gastroparesis and Wernicke's encephalopathy were not identified as risks.

**B.    Defendant's Marketing and Promotion of Mounjaro**

22.    On May 13, 2022, Eli Lilly announced approval of Mounjaro, proclaiming "Mounjaro's safety … in a broad range of adults with type 2 diabetes."[6]

23.    At all relevant times, Eli Lilly was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and/or distribute Mounjaro.

24.    On October 6, 2022, Eli Lilly announced that the FDA had "granted Fast Track designation for the investigation of tirzepatide" to treat obese or overweight adults.[7]

---

[5] FDA Approval Letter for NDA 215866 (Mounjaro) available at
https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2022/215866Orig1s000ltr.pdf (last visited on 8/24/23).
[6] *FDA approves Lilly's Mounjaro™ (tirzepatide) injection, the first and only GIP and GLP-1 receptor agonist for the treatment of adults with type 2 diabetes*, Cision PR Newswire (May 13, 2022) available at
https://www.prnewswire.com/news-releases/fda-approves-lillys-mounjaro-tirzepatide-injection-the-first-and-only-gip-and-glp-1-receptor-agonist-for-the-treatment-of-adults-with-type-2-diabetes-301547339.html (last visited on 8/24/23).
[7] *Lilly Receives U.S. FDA Fast Track designation for tirzepatide for the treatment of adults with obesity, or overweight with weight-related comorbidities* (October 6, 2022) available at https://investor.lilly.com/news-releases/news-release-details/lilly-receives-us-fda-fast-track-designation-tirzepatide (last visited on 8/24/23).

25.     In March 2023, it was reported that Eli Lilly kicked off a full-scale consumer campaign for Mounjaro after launching a digital campaign in January, including a 75-second TV spot supporting Mounjaro aired on FOX on February 12, the same day as Super Bowl LVII.[8]

26.     On April 11, 2023, the New York Times reported that Mounjaro was "gaining attention, with many people using it off-label to lose weight." The article described research which "found that Mounjaro may be even more powerful" than Ozempic, which it reported had recently "steamrollered through TikTok, talk shows and tabloids as people raved about using it off-label to lose weight." Although Eli Lilly denied promoting or encouraging "the off-label use of any of our medicines[,]" it was obvious to Eli Lilly and others in the industry that Mounjaro was following Ozempic's rising popularity for its weight loss effects. Furthermore, the same article also noted Eli Lilly's October announcement regarding the FDA's fast-track designation for its review of tirzepatide.[9]

**D.     Defendant's Drug Delays Gastric Emptying**

27.     Semaglutide belongs to a class of medications known as glucagon-like peptide-1 receptor agonists (GLP-1 RAs).[10]

28.     Tirzepatide is also a GLP-1 RA medication in addition to being a glucose-dependent insulinotropic polypeptide (GIP) receptor agonist.[11]

---

[8] O'Brien J, Medical Marketing and Media, *Eli Lilly kicks off consumer campaign for diabetes drug Mounjaro* (March 9, 2023) available at https://www.mmm-online.com/home/channel/campaigns/eli-lilly-kicks-off-consumer-campaign-for-diabetes-drug-mounjaro/ (last visited on 8/24/23).
[9] Blum D, *The Diabetes Drug That Could Overshadow Ozempic,* The New York Times (published April 11, 2023, updated June 24, 2023) available at https://www.nytimes.com/2023/04/11/well/live/ozempic-mounjaro-weight-loss-diabetes.html (last visited on 8/24/23).
[10] Smits MM & Van Raalte DH (2021), *Safety of Semaglutide*, Front. Endocrinol., 07 July 2021, doi: 10.3389/fendo.2021.645563 (last visited on 8/24/23).
[11] Farzam & Patel, *Tirzepatide,* National Library of Medicine (July 2, 2023), available at https://www.ncbi.nlm.nih.gov/books/NBK585056/ (last visited 8/24/23).

29.     GLP-1 RAs mimic the activities of physiologic GLP-1, which is a gut hormone that activates the GLP-1 receptor in the pancreas to stimulate the release of insulin and suppress glucagon.[12]

30.     In addition, Defendant knew or should have known from published medical literature that non-pancreatic effects of GLP-1 include slowing of gastric emptying.[13]

31.     It is well documented in the literature that GLP-1 RAs cause delayed gastric emptying. For example, a study published in October 2017 (before Defendant began marketing and selling its GLP-1 RA drug) evaluated the effect of GLP-1 RAs on gastrointestinal tract motility and residue rates and explained that "GLP-1 suppresses gastric emptying by inhibiting peristalsis of the stomach while increasing tonic contraction of the pyloric region." The study authors concluded that the GLP-1 RA drug liraglutide "exhibited gastric-emptying delaying effects" and "the drug also inhibited duodenal and small bowel movements at the same time."[14]

32.     As early as 2010, a study published in The Journal of Clinical Endocrinology & Metabolism indicated that that GLP-1 slows gastric emptying.[15]

33.     Defendant knew or should have known of this risk of gastroparesis from the clinical trials.

---

[12] Hinnen D, *Glucagon-Like Peptide 1 Receptor Agonists for Type 2 Diabetes*, 30(3) Diabetes Spectr., 202–210 (August 2017) available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5556578/ (last visited on 8/24/23).
[13] Deane AM et al., *Endogenous Glucagon-Like Peptide-1 Slows Gastric Emptying in Healthy Subjects, Attenuating Postprandial Glycemia*, 95(1) J Clinical Endo Metabolism, 225-221 (January 1, 2010) available at https://academic.oup.com/jcem/article/95/1/215/2835243 (last visited on 8/24/23); American Society of Anesthesiologists, *Patients Taking Popular Medications for Diabetes and Weight Loss Should Stop Before Elective Surgery, ASA Suggests* (June 29, 2023) available at https://www.asahq.org/about-asa/newsroom/news-releases/2023/06/patients-taking-popular-medications-for-diabetes-and-weight-loss-should-stop-before-elective-surgery (last visited on 8/24/23).
[14] Nakatani Y et al., *Effect of GLP-1 receptor agonist on gastrointestinal tract motility and residue rates as evaluated by capsule endoscopy*, 43(5) Diabetes & Metabolism, 430-37 (October 2017) available at https://www.sciencedirect.com/science/article/pii/S1262363617301076 (last visited on 8/24/23).
[15] Deane AM et al., *Endogenous Glucagon-Like Peptide-1 Slows Gastric Emptying in Healthy Subjects, Attenuating Postprandial Glycemia*, 95(1) J Clinical Endo Metabolism, 225-221 (January 1, 2010) available at https://academic.oup.com/jcem/article/95/1/215/2835243 (last visited on 8/24/23).

34.     Two subjects in the Wegovy phase 3 trial pool taking semaglutide 2.4 mg reported moderate adverse events of impaired gastric emptying and both subjects permanently discontinued treatment due to the adverse events. Three subjects also reported mild adverse events of impaired gastric emptying in the semaglutide run-in period of trial 4376.

35.     The cardiovascular outcomes trials for Wegovy included two cases of gastroparesis with the first subject being diagnosed with severe gastroparesis after one month in the trial and second subject being diagnosed with gastroparesis after approximately two months in the trial.

36.     Similarly, a phase 1 study of Mounjaro (GPGA) found that tirzepatide delays gastric emptying.

37.     On information and belief, Defendant not only knew or should have known that their GLP-1 RA drugs cause delayed gastric emptying with a risk of gastroparesis, but they may have sought out this effect due to its association with weight loss. For example, a recent study published in 2023 notes that "it has been previously proposed that long-acting GLP-1RAs could hypothetically contribute to reduced energy intake and weight loss by delaying GE [gastric emptying]" and the study authors suggested "further exploration of peripheral mechanisms through which s.c. semaglutide, particularly at a dose of 2.4. mg/week, could potentially contribute to reduced food and energy intake."[16]

**D.      The Medical Literature and Clinical Trials Gave Defendant Notice of Gastroparesis Being Causally Associated with Mounjaro**

38.     Defendant further knew or should have known of the risk of gastroparesis from the published medical literature.

39.     In August of 2020, medical literature advised that some "patients do not know they have diabetic gastroparesis until they are put on a glucagon-like peptide 1 (GLP-1) receptor agonist

---

[16] Jensterle M et al., *Semaglutide delays 4-hour gastric emptying in women with polycystic ovary syndrome and obesity*, 25(4) Diabetes Obes. Metab. 975-984 (April 2023) available at https://dom-pubs.onlinelibrary.wiley.com/doi/epdf/10.1111/dom.14944 (last visited on 8/24/23).

such as ... semaglutide ... to manage their blood glucose." The article went on to explain that "[t]his class of drugs can exacerbate the symptoms of diabetic gastroparesis. ... Thus, GLP-1 receptor agonist therapy is not recommended for people who experience symptoms of gastroparesis."[17]

40.     In a September 2020 article funded and reviewed by Novo Nordisk, scientists affiliated with that manufacturer reported on two global clinical trials that evaluated the effect of semaglutide in patients with cardiovascular events and diabetes.[18] More patients permanently discontinued taking oral semaglutide (11.6%) than placebo (6.5%) due to adverse events. The most common adverse events associated with semaglutide were nausea (2.9% with semaglutide versus 0.5% with placebo), vomiting (1.5% with semaglutide versus 0.3% with placebo), and diarrhea (1.4% with semaglutide versus 0.4% with placebo). Injectable semaglutide had a discontinuation rate of 11.5-14.5% versus placebo (5.7-7.6%) over a two-year period. The authors acknowledged the potential for severe gastrointestinal events, warning that "[f]or patients reporting severe adverse gastrointestinal reactions, it is advised to monitor renal function when initiating or escalating doses of oral semaglutide."  For patients with other comorbidities, the study warned that "patients should be made aware of the occurrence of gastrointestinal AEs with GLP-1RAs."

41.     A July 2021 article funded and reviewed by Novo Nordisk considered 23 randomized control trials conducted across the United States, Japan, and China and concluded that "gastrointestinal disturbances" were "well-known" side effects associated with semaglutide use.[19] When compared with placebos, the subcutaneous (injection) form of the drug induced nausea in up to 20% of patients (versus 8% on the placebo group), vomiting in up to 11.5% of patients

---

[17] Young CF, Moussa M, Shubrook JH, *Diabetic Gastroparesis: A Review*, Diabetes Spectr. (2020), Aug; 33(3): 290–297, available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7428659/ (last visited on 8/24/23).
[18] Mosenzon O, Miller EM, & Warren ML, *Oral semaglutide in patients with type 2 diabetes and cardiovascular disease, renal impairment, or other comorbidities, and in older patients*, Postgraduate Medicine (2020), 132:sup2, 37-47, available at DOI:10.1080/00325481.2020.1800286 (last visited on 8/24/23).
[19] Smits MM & Van Raalte DH (2021), *Safety of Semaglutide*, Front. Endocrinol., 07 July 2021, doi: 10.3389/fendo.2021.645563 (last visited on 8/24/23).

(versus 3% in the placebo group) and diarrhea in up to 11.3% of patients (versus 6% in the placebo group). Overall, the percentage of patients experiencing adverse events that led to trial product discontinuation was greatest for GI-related adverse events, with some trials experiencing 100% discontinuation due to GI-related adverse events. The mean value of GR-related adverse events that led to discontinuation averaged 57.75%. Semaglutide appears to be associated with more frequent vomiting and nausea as compared to other GLP-1 RAs. The study acknowledges that while nausea and vomiting are unwanted side effects, "they may be partly responsible for aspects of the drug's efficacy."

42.     An October 2021 article in the Journal of Investigative Medicine ("JIM") concluded that because gastroparesis can be associated with several medications, "[i]t is crucial to identify the causative drugs as discontinuation of the drug can result in resolution of the symptoms[.]"[20] In diabetics, making this determination can be particularly "tricky" because both diabetes and GLP-1 RAs can cause delayed gastric emptying. As such, "the timeline of drug initiation and symptom onset becomes of the upmost importance." The authors reviewed two case reports (discussed below) and concluded that history taking and making an accurate diagnosis of diabetic gastroparesis versus medication-induced gastroparesis is critical.

43.     Case Report #1 in JIM involved a 52-year-old female with long-standing (10 years) well-controlled, type 2 diabetes who had been taking weekly semaglutide injections approximately one month prior to the onset of gastroparesis symptoms. The patient was referred with a 7-month history of post-prandial epigastric pain, accompanied by fullness, bloating, and nausea. A gastric emptying study showed a 24% retention of isotope in the patient's stomach at four hours, indicative of delayed gastric emptying. The patient discontinued semaglutide and her symptoms resolved

---

[20] Kalas MA, Galura GM, McCallum RW, *Medication-Induced Gastroparesis: A Case Report*, J Investig Med High Impact Case Rep. 2021 Jan-Dec; 9: 23247096211051919 available at
https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8529310/ (last visited on 8/24/23).

after six weeks. The case report authors concluded that "thorough history taking revealed the cause [of gastroparesis] to be medication induced."[21]

44.     Case Report #2 in JIM involved a 57-year-old female with a long-standing (16 years) type 2 diabetes who had been taking weekly dulaglutide injections (another GLP-1 RA) for 15 months and suffering from abdominal bloating, nausea, and vomiting for 12 of those months. A gastric emptying study showed 35% retention of isotope in the patient's stomach at four hours, indicating delayed gastric emptying. After discontinuing dulaglutide, the patient experienced a gradual resolution of symptoms over a four-week period.[22]

45.     On June 29, 2023, the American Society of Anesthesiologists ("ASA") warned that patients taking semaglutides and other GLP-1 RAs should stop the medication at least a week before elective surgery because these medications "delay gastric (stomach) emptying" and "the delay in stomach emptying could be associated with an increased risk of regurgitation and aspiration of food into the airways and lungs during general anesthesia and deep sedation."[23] The ASA also warned that the risk is higher where patients on these medications have experienced nausea and vomiting.

46.     Upon information and belief, Defendant knew or should have known of the causal association between the use of GLP-1 RAs and the risk of developing gastroparesis. Defendant's actual and constructive knowledge derived from their clinical studies, case reports, medical literature, including the medical literature and case reports referenced above in this Complaint.

---

[21] Kalas MA, Galura GM, McCallum RW, *Medication-Induced Gastroparesis: A Case Report*, J Investig Med High Impact Case Rep. 2021 Jan-Dec; 9: 23247096211051919 available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8529310/ (last visited on 8/24/23).
[22] Kalas MA, Galura GM, McCallum RW, *Medication-Induced Gastroparesis: A Case Report*, J Investig Med High Impact Case Rep. 2021 Jan-Dec; 9: 23247096211051919 available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8529310/ (last visited on 8/24/23).
[23] American Society of Anesthesiologists, *Patients Taking Popular Medications for Diabetes and Weight Loss Should Stop Before Elective Surgery, ASA Suggests* (June 29, 2023) available at https://www.asahq.org/about-asa/newsroom/news-releases/2023/06/patients-taking-popular-medications-for-diabetes-and-weight-loss-should-stop-before-elective-surgery (last visited on 8/24/23).

47.     Upon information and belief, Defendant ignored the causal association between the use of GLP-1 RAs and the risk of developing gastroparesis.

48.     Defendant's failure to disclose information that it possessed regarding the causal association between the use of GLP-1 RAs and the risk of developing gastroparesis, rendered the warnings for their medication inadequate.

**E.     Defendant Failed to Warn of the Risk of Gastroparesis From Mounjaro**

49.     Gastroparesis is a disorder that slows or stops the movement of food from the stomach to the small intestine, even though there is no blockage in the stomach or intestines. Gastroparesis may also be called delayed gastric emptying.[24]

50.     Symptoms of gastroparesis include nausea, vomiting, early satiation, postprandial fullness, bloating, and upper abdominal pain, which can be refractory and challenging to manage, leading to reduced quality of life and significant health care expenditure.[25]

51.     As noted above, as early as 2020, studies conducted on the safety of semaglutide identified the prevalence of gastrointestinal adverse effects, including nausea and vomiting. One study reported that gastrointestinal complaints are the main adverse-event related cause of drug discontinuation in phase-3 trials, suggesting that these "common side effects" are severe and persistent.[26]

---

[24]Camilleri M, National Institute of Diabetes and Digestive and Kidney Diseases, *Gastroparesis*, available at https://www.niddk.nih.gov/health-information/digestive-diseases/gastroparesis (last visited on 8/24/23).
[25] Zheng T, Camilleri M, *Management of Gastroparesis*, Gastroenterology & Hepatology (Nov. 2021), Vol. 17, Issue 11, available at https://www.gastroenterologyandhepatology.net/archives/november-2021/management-of-gastroparesis/ (last visited on 8/24/23).
[26] Mosenzon O, Miller EM, & Warren ML (2020) Oral semaglutide in patients with type 2 diabetes and cardiovascular disease, renal impairment, or other comorbidities, and in older patients, Postgraduate Medicine, 132:sup2, 37-47, DOI:10.1080/00325481.2020.1800286 (last visited on 8/24/23); *see also* Smits, MM & Van Raalte, DH (2021), *Safety of Semaglutide*, Front. Endocrinol., 07 July 2021, doi: 10.3389/fendo.2021.645563 available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8294388/ (last visited on 8/24/23).

52.     Studies also identified a link between nausea induced by GLP-1RAs and weight loss, leading some authors to suggest that nausea and vomiting may play a role in the drug's efficacy.[27]

53.     The Mounjaro label lists nausea, diarrhea, decreased appetite, vomiting, constipation, dyspepsia, and abdominal pain as common adverse reactions, but it does not indicate a severity of symptoms. Even though the label warns about the risk of Severe Gastrointestinal Disease, gastroparesis is not specifically mentioned.

54.     From the date Eli Lilly received FDA approval to market Mounjaro until the present time, Eli Lilly made, distributed, marketed, and/or sold Mounjaro without adequate warning to Plaintiff's prescribing physician(s) and/or Plaintiff that Mounjaro was causally associated with and/or could cause gastroparesis.

55.     Upon information and belief, Defendant knew or should have known of the causal association between the use of GLP-1 RAs and the risk of developing gastroparesis. Defendant's actual and constructive knowledge derived from their clinical studies, case reports, and the medical literature, including the medical literature and case reports referenced above in this Complaint.

56.     Upon information and belief, Defendant ignored the causal association between the use of GLP-1 RAs and the risk of developing gastroparesis.

57.     Defendant's failure to disclose information that they possessed regarding the causal association between the use of GLP-1 RAs and the risk of developing gastroparesis, rendered the warnings for this medication inadequate.

58.     By reason of the foregoing acts and omissions, Plaintiff was and still is caused to suffer from gastroparesis and its sequelae, which resulted in other severe and personal injuries which are permanent and lasting in nature, physical pain, and mental anguish, including

---

[27] *Id.*

diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications, and fear of developing any of the above-named health consequences.

### FIRST CAUSE OF ACTION
### (INADEQUATE WARNING UNDER LA. R.S. 9:2800.57)

59.     Plaintiff repeats, reiterates, and realleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

60.     Louisiana law imposes a duty on producers, manufacturers, distributors, lessors, and sellers of a product to exercise all reasonable care when producing, manufacturing, distributing, leasing, and selling their products.

61.     At all times mentioned herein, the Defendant designed, researched, manufactured, tested, advertised, promoted, marketed, sold and/or distributed the Mounjaro that was used by the Plaintiff.

62.     Mounjaro was expected to and did reach the usual consumers, handlers, and persons coming into contact with said products without substantial change in the condition in which it was produced, manufactured, sold, distributed, and marketed by the Defendant.

63.     At all relevant times, and at the times Mounjaro left the Defendant's control, Defendant knew or should have known that Mounjaro was unreasonably dangerous because it did not adequately warn of the risk of gastroparesis, especially when used in the form and manner as provided by Defendant.

64.     Despite the fact that Defendant knew or should have known that Mounjaro caused unreasonably dangerous injuries, Defendant continued to market, distribute, and/or sell Mounjaro to consumers, including Plaintiff, without adequate warnings.

65.     Despite the fact that Defendant knew or should have known that Mounjaro caused unreasonably dangerous injuries, Defendant continued to market Mounjaro to prescribing physicians, including Plaintiff's prescribing physician(s), without adequate warnings.

66.     Defendant knew or should have known that consumers such as the Plaintiff would foreseeably suffer injury as a result of their failure to provide adequate warnings, as set forth herein.

67.     At all relevant times, given their increased safety risks, Mounjaro was not fit for the ordinary purpose for which it was intended—namely, as an adjunct to diet and exercise to improve glycemic control in adults with type 2 diabetes mellitus.

68.     At all relevant times, given increased safety risks, Mounjaro did not meet the reasonable expectations of an ordinary consumer, particularly the Plaintiff.

69.     Defendant had a duty to exercise reasonable care in the designing, researching, testing, manufacturing, marketing, supplying, promotion, advertising, packaging, sale, and/or distribution of Mounjaro into the stream of commerce, including a duty to assure that the product would not cause users to suffer unreasonable, dangerous injuries, such as gastroparesis.

70.     At all relevant times, Plaintiff was using Mounjaro for the purposes and in a manner normally intended—namely, as an adjunct to diet and exercise to improve glycemic control in adults with type 2 diabetes mellitus.

71.     The Mounjaro designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendant was defective due to inadequate warnings or instructions, as the Defendant knew or should have known that the product created a risk of serious and dangerous injuries, including gastroparesis, as well as other severe and personal injuries which are permanent and lasting in nature and the Defendant failed to adequately warn of said risk.

72.     The Mounjaro designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendant was defective due to inadequate post-marketing surveillance and/or warnings because, after Defendant knew or should have known of the risks of serious side effects, including gastroparesis, as well as other severe and permanent health consequences from Mounjaro, it failed to provide adequate warnings to users and/or prescribers of the product, and continued to improperly advertise, market and/or promote its product, Mounjaro.

73.     The label for Mounjaro was inadequate because it did not warn and/or adequately warn of all possible adverse side effects causally associated with the use of Mounjaro, including the increased risk of gastroparesis.

74.     The label for Mounjaro was inadequate because it did not warn and/or adequately warn that Mounjaro had not been sufficiently and/or adequately tested for safety risks, including gastroparesis.

75.     The label for Mounjaro was inadequate because it did not warn and/or adequately warn of all possible adverse side effects concerning the failure and/or malfunction of Mounjaro.

76.     The label for Mounjaro was inadequate because it did not warn and/or adequately warn of the severity and duration of such adverse effects, as the warnings given did not accurately reflect the symptoms, or severity of the side effects.

77.     Communications made by Defendant to Plaintiff and her prescribing physician(s) were inadequate because Defendant failed to warn and/or adequately warn of all possible adverse side effects causally associated with the use of Mounjaro, including the increased risk of gastroparesis.

78.     Communications made by Defendant to Plaintiff and her prescribing physician(s) were inadequate because Defendant failed to warn and/or adequately warn that Mounjaro had not been sufficiently and/or adequately tested for safety risks, including gastroparesis.

79.     Plaintiff had no way to determine the truth behind the inadequacies of Defendant's warnings as identified herein, and her reliance upon Defendant's warnings was reasonable.

80.     Plaintiff's prescribing physician(s) had no way to determine the truth behind the inadequacies of Defendant's warnings as identified herein, and his/her/their reliance upon Defendant's warnings was reasonable.

81.     Upon information and belief, had Plaintiff's prescribing physician(s) been warned of the increased risk of gastroparesis causally associated with Mounjaro, he/she/they would not have prescribed Mounjaro and/or would have provided Plaintiff with adequate warnings regarding the dangers of Mounjaro so as to allow Plaintiff to make an informed decision regarding her use of Mounjaro.

82.     Upon information and belief, had Plaintiff's prescribing physician(s) been warned that Mounjaro had not been sufficiently and/or adequately tested for safety risks, including gastroparesis, he/she/they would not have prescribed Mounjaro and/or would have provided Plaintiff with adequate warnings regarding the lack of sufficient and/or adequate testing of Mounjaro so as to allow Plaintiff to make an informed decision regarding her use of Mounjaro.

83.     Had Plaintiff been warned of the increased risk of gastroparesis causally associated with Mounjaro, she would not have used Mounjaro and/or suffered from gastroparesis and its sequelae.

84.     Had Plaintiff been warned that Mounjaro had not been sufficiently and/or adequately tested for safety risks, including gastroparesis, she would not have used Mounjaro and/or suffered gastroparesis and its sequelae.

85.     Had Plaintiff been warned of the increased risk of gastroparesis causally associated with Mounjaro, she would have informed her prescribers that she did not want to take Mounjaro.

86.     Upon information and belief, if Plaintiff had informed her prescribing physician(s) that she did not want to take Mounjaro due to the risk of gastroparesis, her prescribing physician(s) would not have prescribed Mounjaro.

87.     By reason of the foregoing, Defendant has become liable to the Plaintiff for the designing, marketing, promoting, distribution and/or selling of an unreasonably dangerous product, Mounjaro.

88.     Defendant designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed a defective product which created an unreasonable risk to the health of consumers and to the Plaintiff in particular, and Defendant is therefore liable for the injuries sustained by the Plaintiff in accordance with LA R.S. 9:2800.57.

89.     Defendant's inadequate warnings of Mounjaro were acts that amount to willful, wanton, and/or reckless conduct by Defendant.

90.     That said inadequate warnings in Defendant's drug Mounjaro were a substantial factor in causing Plaintiff's injuries.

91.     As a result of the foregoing acts and omissions, the Plaintiff was caused to suffer serious and dangerous injuries including gastroparesis and its sequelae, which resulted in other severe and personal injuries which are permanent and lasting in nature, physical pain, and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications, and fear of developing any of the above-named health consequences.

92.     As a result of the foregoing acts and omissions the Plaintiff requires and/or will require more health care and services and did incur medical, health, incidental, and related expenses. Plaintiff is informed and believes and further alleges that she will require future medical and/or hospital care, attention, and services.

## SECOND CAUSE OF ACTION
## (BREACH OF EXPRESS WARRANTY UNDER LA. R.S. 9:2800.58)

93.     Plaintiff repeats, reiterates, and realleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

94.     At all relevant times, Defendant designed, researched, manufactured, tested, advertised, promoted, marketed, sold, distributed, and/or have acquired the Defendant who designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed Mounjaro as hereinabove described that was used by Plaintiff.

95.     At all relevant times, Defendant expressly warranted to Plaintiff and her prescribing physician(s) that Mounjaro was safe as an adjunct to diet and exercise to improve glycemic control in adults with type 2 diabetes mellitus.

96.     The aforementioned express warranties were made to Plaintiff and Plaintiff's prescribing physician by way of Mounjaro's label, website, advertisements, promotional materials, and through other statements.

97.     As a result of Defendant's express warranties to her prescribing physician(s), he/she/they were induced to prescribe Mounjaro to Plaintiff, and Plaintiff was induced to use Mounjaro.

98.     At all relevant times, Defendant reasonably anticipated and expected that individuals, such as the Plaintiff, would use and/or consume Mounjaro based upon its express warranties.

99.     At all relevant times, Defendant reasonably anticipated and expected that prescribing physicians, such as the Plaintiff's prescribing physician(s), would recommend, prescribe and/or dispense Mounjaro based upon its express warranties.

100.    At all relevant times, Defendant knew or should have known that Mounjaro was unreasonably dangerous because of its increased risk of gastroparesis, especially when the drug was used in the form and manner as provided by Defendant.

101.    At all relevant times, Defendant knew or should have known that Mounjaro had not been sufficiently and/or adequately tested for safety.

102.    The unreasonably dangerous characteristics of Mounjaro were beyond that which would be contemplated by the ordinary user, such as Plaintiff, with the ordinary knowledge common to the public as to the drug's characteristics.

103.    The unreasonably dangerous characteristics of Mounjaro were beyond that which would be contemplated by Plaintiff's prescribing physician(s), with the ordinary knowledge common to prescribing physician as to the drug's characteristics.

104.    At the time Mounjaro left the Defendant's control, Mounjaro did not conform to Defendant's express warranties because Mounjaro was not safe to use as an adjunct to diet and exercise to improve glycemic control in adults with type 2 diabetes mellitus, in that it was causally associated with an increased risk of gastroparesis.

105.    The express warranties made by Defendant regarding the safety of Mounjaro were made with the intent to induce Plaintiff to use the product and/or her prescribing physician(s) to prescribe the product.

106.    Defendant knew and/or should have known that by making the express warranties to Plaintiff and/or her prescribing physician(s) it would be the natural tendency of Plaintiff to use Mounjaro and/or the natural tendency of her prescribing physician(s) to prescribe Mounjaro.

107.    Plaintiff and her prescribing physician(s), as well as members of the medical community, relied on the express warranties of the Defendant identified herein.

108.    Had Defendant not made these express warranties, Plaintiff would not have used Mounjaro and/or, upon information and belief, her prescribing physician(s) would not have prescribed Mounjaro.

109.    Plaintiff's injuries and damages were directly caused by Defendant's breach of the aforementioned express warranties.

110.    Plaintiff's injuries and damages arose from a reasonably anticipated use of the products by Plaintiff.

111.    Accordingly, Defendant is liable as a result of its breach of express warranties to Plaintiff.

112.    As a result of the foregoing breaches, Plaintiff was caused to suffer serious and dangerous injuries including gastroparesis and its sequelae, which resulted in other severe and personal injuries which are permanent and lasting in nature, physical pain, and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications, and fear of developing any of the above-named health consequences.

113.    By reason of the foregoing, Plaintiff has been severely and permanently injured and will require more constant and continuous medical monitoring and treatment than prior to Plaintiff's use of Defendant's Mounjaro drug.

114.    As a result of the foregoing acts and omissions the Plaintiff requires and/or will require more health care and services and did incur medical, health, incidental, and related expenses. Plaintiff is informed and believes and further alleges that she will require future medical and/or hospital care, attention, and services.

### THIRD CAUSE OF ACTION
### (LOSS OF CONSORTIUM, SERVICES AND SOCIETY)

115.     Plaintiff, MARK SMITH, who is the husband of Robin Smith, has suffered a loss of consortium, services and society to his wife, Robin Smith, due to the injuries Defendant's acts and omissions caused to Robin Smith, the damages for which the Defendant is additionally liable.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, ROBIN SMITH AND MARK SMITH, demand judgment against the Defendant on each of the above-referenced claims and Causes of Action and as follows:

1.     Awarding compensatory damages to Plaintiff, ROBIN SMITH, for past and future damages, including but not limited to pain and suffering for severe and permanent personal injuries sustained by the Plaintiff, ROBIN SMITH, health care costs, medical monitoring, together with interest and costs as provided by law;

2.     Awarding compensatory damages to Plaintiff, MARK SMITH, for his loss of consortium, services and society to his wife, Robin Smith;

3.     Punitive and/or exemplary damages for the wanton, willful, fraudulent, reckless acts of the Defendant who demonstrated a complete disregard and reckless indifference for the safety and welfare of the general public and to the Plaintiff, ROBIN SMITH, in an amount sufficient to punish Defendant and deter future similar conduct;

4.     Awarding Plaintiffs, ROBIN SMITH and MARK SMITH, the costs of these proceedings; and

5.     Such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial by jury as to all issues.

Dated: December 4, 2023

Respectfully submitted,

**THE TOWNSLEY LAW FIRM**

BY:     */s/ David H. Hanchey*
          **DAVID H. HANCHEY, Bar Roll #19927**
          **TODD A. TOWNSLEY, Bar Roll #21095**
          **HANNAH E. MAYEAUX, Bar Roll #39275**
          3102 Enterprise Boulevard
          Lake Charles, LA  70601
          Telephone:  (337) 478-1400
          Facsimile:  (337) 478-1577
          Email: david@townsleylawfirm.com;
          hanna@townsleylawfirm.com;
          jboone@townsleylawfirm.com;
          ahebert@townsleylawfirm.com
          *Attorneys for Plaintiff, Robin Smith*